UNITED STATES of America,
Plaintiff–Appellee,

v.

Wesley Norvette HAWKINS,
Defendant–Appellant.

No. 94–3436.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 14, 1995.

Decided July 14, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 24, 1995.

Virginia Villa, Federal Public Defender, Minneapolis, MN, argued, for appellant.

Jeffrey Paulsen, Asst. U.S. Atty., Minneapolis, MN, argued, for appellee.

Before BOWMAN, BEAM, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

Wesley Norvette Hawkins appeals from the final judgment entered by the district court [1] after a jury found him guilty of sever-

---

[1]. The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

al drug and weapon offenses. Hawkins challenges his convictions and sentences. We affirm.

I.

On October 20, 1993, at approximately 1:07 a.m., Sergeant Stuart Robinson received a 911 call from a resident of apartment 204 at 6325 Camden Avenue North in Brooklyn Center, Minnesota. The caller complained about a disturbance in apartment 304. Sergeant Robinson dispatched Officers Alex Karris and Gary Coleman to investigate.

While the officers were en route, Sergeant Robinson received another 911 call at approximately 1:14 a.m. from a SuperAmerica convenience store. The caller identified herself as Louise Hawkins and requested that police officers be sent to 6325 North Camden, apartment 304. Ms. Hawkins stated that her husband had "just pulled a gun out on [her]," it was "a big gun with a clip," which looked "like some kind of automatic," and it was "a handgun." (Appellant's Addend. at D1–D2.) Ms. Hawkins identified her husband as Wesley Hawkins, described him as a black male, stated that he was still in the apartment along with another woman, and stated that "there's also drugs and everything else in that apartment up there." (*Id.* at D2.)

Sergeant Robinson passed this information to Officers Karris and Coleman, who were still en route. When the officers arrived at 6325 Camden, they went to the third floor, where apartment 304 is located. Officer Karris saw a black man in the hallway area carrying a set of keys. The man was between apartment 304 and the door for the laundry room and walking toward apartment 304. After the man identified himself as Wesley Hawkins, the officers placed him in handcuffs. Hawkins informed the officers that there was a woman still in apartment 304. After the officers ordered the woman to come out, Veronica Moore emerged into the hallway.

Officer Karris then entered apartment 304 through the open door and performed a "protective sweep," purportedly to determine whether other individuals remained in the apartment. Officer Coleman remained in the hallway with Veronica Moore and Hawkins. While conducting the sweep, Officer Karris observed a box of ammunition in a bedroom closet. Officer Karris and Sergeant Robinson, who by this time had arrived on the scene, conducted a further search of apartment 304 after Hawkins provided consent. However, the officers did not find a gun. Officer Coleman later searched the common laundry room area and noticed several storage lockers with padlocks.

Louise Hawkins was brought to the scene and continued to insist that Hawkins had earlier threatened her with a gun, which the officers had not yet found. She provided a detailed description of the gun, stating that it was larger than Sergeant Robinson's service revolver, was black or gray, and had a round piece of metal over the barrel with holes in it. She also informed Sergeant Robinson that Hawkins, who was on probation, was dealing drugs. The officers subsequently took Hawkins and Ms. Hawkins to the police station.

At the police station, Officer Coleman conducted an inventory search of Hawkins and discovered two loose keys in his pocket. These keys matched two keys Hawkins had been carrying earlier in the hallway at 6325 Camden. Sergeant Robinson obtained both sets of keys and returned to the laundry room at 6325 Camden. Sergeant Robinson discovered that one of the keys opened the padlock on a storage locker. After making that discovery, he resecured the padlock without opening the storage locker.

Officers later obtained a search warrant for the storage locker and conducted a search. They found a gym bag with a zippered pouch in the front portion of the locker. In the zippered pocket they found a baggie containing 19 grams of crack cocaine. Immediately behind the gym bag was a red tool box with a padlock. One of the keys from Hawkins' pocket opened the padlock. The officers found approximately one kilogram of powder cocaine inside the red tool box. At the rear of the storage locker they found a black plastic case which contained a 9 mm semi-automatic pistol and a loaded magazine (containing 20 live rounds of ammunition) that was not in the weapon.

Hawkins was indicted for two counts of possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), one count of using a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). A jury found Hawkins guilty on all counts. The district court sentenced Hawkins at the bottom of the identified Guideline range on counts I and II to 262 months (Level 34, Criminal History Category VI = 262 − 327 months) and imposed the mandatory 60 month consecutive sentence on the § 924(c) conviction, for a total sentence of 322 months. Hawkins appeals.

## II.

### A.

Hawkins argues that the district court erred by denying his motion to suppress evidence. He first argues a "protective sweep" may only be conducted incident to a valid underlying arrest under *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 1094–95, 108 L.Ed.2d 276 (1990). He contends that he was not arrested until after Officer Karris conducted the "protective sweep" of apartment 304 and discovered the 9 mm ammunition, and therefore that the fruits of the "protective sweep" made before the arrest must be suppressed. The magistrate judge[2] determined that Hawkins was arrested when the officers placed the handcuffs on him, before the protective sweep was conducted. The district court adopted that conclusion.

We review de novo the question of whether a police encounter with a citizen amounted to an arrest. *United States v. Bloomfield,* 40 F.3d 910, 916 (8th Cir.1994) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995). "Although there is no bright line of demarcation between investigative stops and arrests, a *de facto* arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop." *Id.* at 916–17 (quotations and citations omitted). Placing handcuffs on a

suspect is a factor which weighs in favor of finding an arrest. *Id.* at 917. In this case, we have little difficulty finding that Hawkins was arrested when officers placed handcuffs on him and detained him in the hallway area. Hawkins offers as support for this argument Sergeant Robinson's testimony that the decision to arrest Hawkins was based upon Officer Karris's discovery of the ammunition in the closet. Sergeant Robinson, however, was not even present when the handcuffs were placed on Hawkins. Hence, we conclude that Hawkins was arrested prior to the point at which Officer Karris conducted the "protective sweep."

Hawkins next argues that even if he was arrested when the officers handcuffed him, Officer Karris's "protective sweep" of apartment 304 was unlawful because that warrantless arrest was made without probable cause. The magistrate judge determined that the arresting officers possessed probable cause to support the warrantless arrest and, therefore, the subsequent "protective sweep" was lawful. The district court adopted that conclusion.

Officers may conduct a "protective sweep" of the premises incident to a lawful arrest. *Buie,* 494 U.S. at 327, 110 S.Ct. at 1094–95. We therefore must determine the legality of the warrantless arrest. "In determining whether probable cause exists to make a warrantless arrest, the court looks to the totality of the circumstances to see whether a prudent person would believe the individual had committed or was committing a crime." *United States v. Segars,* 31 F.3d 655, 659 (8th Cir.1994) (citing *Illinois v. Gates,* 462 U.S. 213, 232, 233, 103 S.Ct. 2317, 2329, 2329–30, 76 L.Ed.2d 527 (1983)). "In establishing probable cause, law enforcement officials enjoy substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Horne,* 4 F.3d 579, 589 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1121, 127 L.Ed.2d 430 (1994). "While a 'bare suspicion' of criminal activity is not sufficient to establish probable cause, neither are police required to have enough evidence to justify a conviction before

2. The Honorable Franklin L. Noel, United States Magistrate Judge for the District of Minnesota.

they make a warrantless arrest." *United States v. Morales*, 923 F.2d 621, 624 (8th Cir.1991) (quotations and citation omitted). We review the district court's finding that probable cause existed to support Hawkins' arrest for clear error. *Id.* at 623.

■ At the time that Officers Karris and Coleman arrested Hawkins, they were aware of Ms. Hawkins' 911 call in which she requested that officers be sent to apartment 304 because Hawkins had threatened her with a gun, and they also knew that a neighbor had earlier reported the existence of a disturbance in that same apartment. When the officers first encountered Hawkins, he was heading toward apartment 304 with a set of keys in his hands. Given the totality of the circumstances, a prudent person would believe that Hawkins had committed an offense against his wife. Therefore, probable cause existed to support Hawkins' warrantless arrest, and Officer Karris was justified in making a "protective sweep" of apartment 304.[3]

Hawkins next argues that the district court should have suppressed statements he made after his arrest. He relies exclusively on his above argument that his warrantless arrest and the subsequent "protective sweep" were unlawful. Having concluded that Hawkins was lawfully arrested, his postarrest statements were properly admissible.

■ Hawkins finally argues that the evidence seized from the storage locker must be suppressed because probable cause did not exist to issue the search warrant. Probable cause for issuance of a search warrant exists "when there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched." *United States v. Bieri*, 21 F.3d 811, 815 (8th Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 208, 130 L.Ed.2d 138 (1994).

■ In this case, the affidavit in support of the warrant outlined the following factual

information: A resident of apartment 204 called the police to report a domestic dispute in apartment 304. Several minutes later, Ms. Hawkins called the police and stated that she had just been at apartment 304 where her husband displayed a gun during a domestic dispute with her. Hawkins was walking toward apartment 304 and away from the laundry room when the officers first encountered him. The officers searched apartment 304 and the laundry room area but did not find a gun. The laundry room area contains storage lockers. After arresting Hawkins for domestic assault and conducting an inventory of his personal belongings, two single keys were found which matched keys on the key ring Hawkins had been carrying in the hallway. Hawkins gave inconsistent answers regarding the purpose of these keys. Sergeant Robinson later took the keys back to the laundry room at 6325 Camden, and one of the keys opened a padlock. Finally, during an interview with respect to the domestic assault, Ms. Hawkins provided a very detailed description of the gun and that Hawkins took the gun out of a case rather than a holster prior to displaying it. In our view, these facts would justify a prudent person believing that evidence of a crime would be discovered in the storage locker and, therefore, probable cause existed to issue the warrant.

For the reasons outlined above, the district court properly denied Hawkins' motion to suppress.

### B.

Hawkins challenges the sufficiency of the evidence to support his conviction under 18 U.S.C. § 924(c) for using a firearm in relation to a drug trafficking crime. In reviewing this sufficiency of the evidence claim, "we must affirm the conviction if, after viewing the evidence in a light most favorable to the government and giving the government the benefit of all reasonable inferences, we conclude that a reasonable jury could have found

---

**3.** Hawkins' argument that probable cause was lacking for his arrest because he had bleeding scratch marks on his face and hands which tended to indicate that Ms. Hawkins assaulted him and thus had an incentive to lie is unpersuasive.

Given the circumstances, the officers, at a minimum, could have concluded that Mr. and Ms. Hawkins committed crimes of assault against each other and thus decided to arrest both of them.

[Hawkins] guilty beyond a reasonable doubt." *United States v. Jones,* 990 F.2d 1047, 1048 (8th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 699, 126 L.Ed.2d 666 (1994).

■ Section 924(c)(1) of Title 18 prescribes prison terms for "[w]hoever, during and in relation to any … drug trafficking crime …, uses or carries a firearm." Hawkins argues that his conviction must be reversed because there is no evidence that he had in the past distributed drugs, and therefore there is no evidence linking the gun to drug trafficking. In short, Hawkins argues that he merely possessed the gun. The government argues that a reasonable juror could have found Hawkins guilty based on its evidence that apartment 304 was a "stash house" and that the jury could infer that Hawkins kept the gun to protect his cache of drugs. Although "[t]he 'mere possession' of a firearm is insufficient to support a conviction under this section … 18 U.S.C. § 924(c)(1) reaches the possession of a firearm which in any manner facilitates the execution of a felony involving drug trafficking." *United States v. Simms,* 18 F.3d 588, 592 (8th Cir.1994) (quotations and citations omitted). A § 924(c) conviction may be upheld if the firearm was present to protect the supply of drugs and further illegal activity. *Jones,* 990 F.2d at 1049. In *Jones,* we affirmed a § 924(c) conviction because "the evidence strongly support[ed] the finding that [the defendant] used the gun to protect his 'current possession' of drugs," *id.* at 1049, which "he intended for distribution at a later date." *Id.* at 1050.

In this case, a reasonable juror could find that the firearm facilitated a drug trafficking offense because Hawkins kept it to protect his present supply of drugs which he intended for distribution at a later date. When officers brought Ms. Hawkins to 6325 Camden after she made the 911 call, she informed Sergeant Robinson that Hawkins had been dealing drugs. The government introduced expert testimony that the amount of cocaine discovered in the storage locker was suitable for distribution. Sandra Greene testified that at Hawkins' request, she signed a lease in her name for apartment 304, but she never lived in the apartment, Hawkins gave her the money for the deposit, and Hawkins paid the rent every month. The government presented expert testimony that drug dealers commonly rent "stash houses" in the names of other persons.

The government also presented strong evidence to support its theory that Hawkins put the drugs in the storage locker after his wife left apartment 304 as result of their domestic dispute. Ms. Hawkins stated in her 911 call that "there's also drugs and everything else in that apartment up there." (Appellant's Addend. at D2.) At the time the officers first encountered Hawkins, he was heading toward apartment 304 from the area of the laundry room area and possessed keys to open the storage locker and the toolbox inside of the locker. From these facts, a reasonable juror could infer that apartment 304 was a "stash house" for storing drugs and that the firearm was present to guard against the possible theft of the drugs.

■ Hawkins also contends that his conviction cannot stand because the gun was not loaded when it was recovered. However, we have upheld § 924(c) convictions where the gun was not loaded when it was discovered but was located in close proximity to ammunition. *See United States v. Estrada,* 45 F.3d 1215, 1224 (8th Cir.1995) (affirming § 924(c) conviction where gun was not loaded but "was near the partially loaded magazine and could have been used in a matter of seconds"), *petition for cert. filed,* (Apr. 24, 1995) (No. 94–8972). Here, the firearm was discovered within a case which also contained a magazine holding 20 live rounds of ammunition.

■ Hawkins finally argues that the gun was not readily available for use when it was recovered because it was located in a padlocked storage locker. However, Ms. Hawkins testified that she had called the police on prior occasions when she and Hawkins had gotten into domestic disputes. There is sufficient evidence for a reasonable juror to find that after displaying the gun to Ms. Hawkins during the dispute, Hawkins believed that she would call the police, and accordingly took the magazine out of the gun

and put the gun and drugs in the storage locker in the laundry room.

Viewing the evidence in the light most favorable to the verdict, we conclude that a reasonable juror could find that Hawkins used the firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c).

### C.

██ Hawkins next argues that the district court erred with respect to several evidentiary rulings. We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Hazelett*, 32 F.3d 1313, 1316 (8th Cir.1994).

██ Hawkins first contends that the district court abused its discretion by admitting the tape of Ms. Hawkins' 911 call because the contents of the tape are inadmissible hearsay. Specifically, Hawkins argues that Ms. Hawkins assaulted him prior to making the call, and therefore her subsequent statements on the 911 tape lack reliability because she had the time, motive, and ability to fabricate them, and in fact later admitted to fabrication. After listening to the tape, the district court admitted it pursuant to Federal Rules of Evidence 803(1), (2), and (8)(B).

We conclude that Ms. Hawkins' statements from the 911 tape were admissible as a "present sense impression" under Rule 803(1). Under that rule, a court may admit as an exception to the hearsay rule "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter," even though the declarant is available to testify. Fed.R.Evid. 803(1). " 'The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication. There is no *per se* rule indicating what time interval is too long under Rule 803(1)....' " *United States v. Parker*, 936 F.2d 950, 954 (7th Cir.1991)

(quoting *United States v. Blakey*, 607 F.2d 779, 785 (7th Cir.1979)).

In this case, the facts indicate that Ms. Hawkins' 911 call was placed with sufficient contemporaneity to the underlying events to be admissible under Rule 803(1). The occupants of apartment 204 placed a 911 call at approximately 1:07 a.m. complaining about a disturbance in apartment 304. Ms. Hawkins placed her 911 call at approximately 1:14 a.m. from a nearby SuperAmerica convenience store. Further, Ms. Hawkins stated that "my husband *just* pulled a gun out on me." (Appellant's Addend. at D1.) (emphasis added) Other courts have held in similar circumstances that statements on 911 tapes are admissible as a present sense impression. *See United States v. Mejia–Valez*, 855 F.Supp. 607 (E.D.N.Y.1994) (tapes of two 911 calls, one 2–3 minutes after shooting, the other approximately 16 minutes after shooting, sufficiently contemporaneous with event and therefore admissible as present sense impression); *United States v. Campbell*, 782 F.Supp. 1258, 1260–61 (N.D.Ill.1991) (statements on 911 tape admissible as present sense impression where call made almost immediately after defendant left store after shooting incident). *See also Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir.1995) (under certain circumstances statements on 911 tape may be admissible as a present sense impression).

Further, Ms. Hawkins' statements show reliability because she was able to describe the gun in some detail, stating that "[i]t's a big gun with a clip ... it looks like some kind of automatic," and it is "a handgun, but it's real big." (Appellant's Addend. at D1–D2.) Ms. Hawkins also stated that there was someone else in the apartment with her husband. *See Blakey*, 607 F.2d at 785–86 (affirming admission of statements as present sense impression where interval was potentially 23 minutes because substantial circumstantial evidence corroborated the accuracy of the statements). Therefore, the district court did not abuse its discretion in admitting the tape of the 911 call placed by Ms. Hawkins.[4]

---

**4.** Because we have concluded that the statements on the 911 tape were admissible as a present sense impression under Rule 803(1), we need not address the district court's determination that they were admissible under Rules 803(2) and (8)(B) as well.

Hawkins next argues that the district court abused its discretion in limiting defense counsel's redirect examination of Ms. Hawkins regarding her basis of knowledge about the weapon. Hawkins now argues that Ms. Hawkins should have been permitted to testify about one Lewis Carter's previous description of the weapon to her in order to render her testimony intelligible because she had earlier testified that she had never seen the gun but was able to describe it in detail on the night Hawkins was arrested. Such a basis for admission was not advanced before the district court at trial.

After a careful review of the record, we are satisfied that the district court did not abuse its discretion in excluding this testimony on the basis that it was hearsay. The questions apparently sought out-of-court statements by Lewis Carter concerning the weapon and the district court was free to believe, absent an offer of proof to the contrary, that the statements were offered to show, consistent with the defense theory, that Lewis Carter, rather than Hawkins, actually possessed the gun. *See* Fed.R.Evid. 801(c) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Thus, the district court did not abuse its discretion in sustaining the objections.

Finally, Hawkins contends that the district court abused its discretion by refusing to admit testimony from one Leon Hubbart that he had spoken to Ms. Hawkins immediately after the domestic incident, and she had not mentioned the presence of the gun to him. Federal Rule of Evidence 801(d)(1)(B) provides that an out-of-court statement is not hearsay if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge of recent fabrication or improper influence or motive." Hawkins argues that this testimony was admissible under Rule 801(d)(1)(b) to rebut the inference of recent fabrication the prosecutor raised during cross-examination of Ms. Hawkins, where she directly contradicted her statements about seeing the gun on the night of the incident. The district court refused to admit the testimony because Ms. Hawkins had recanted her story about seeing the gun the day after the incident (which was six months prior to trial). Any fabrication was not recent.

Even if we were to assume arguendo that the district court erred in excluding this testimony, we believe that the exclusion was harmless error. *See United States v. DeAngelo,* 13 F.3d 1228, 1233 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994); Fed.R.Crim.P. 52(a). The jury heard the substance of the excluded testimony when it heard Ms. Hawkins testify that she made up the story about the gun because she was mad at her husband and knew that her statements would get him in trouble because he was on probation. Moreover, because of the strength of the other evidence against Hawkins there is little likelihood that the jury would have been "substantially swayed" by the evidence. *See DeAngelo,* 13 F.3d at 1233. Any error by the district court in excluding this evidence was harmless and does not provide a basis for reversing Hawkins' conviction.

### D.

Finally, Hawkins contends that we should remand this case for resentencing because the district court misunderstood its ability to grant a downward departure. At sentencing, Hawkins made an untimely oral motion for a downward departure under U.S.S.G. § 4A1.3. The district court allowed the motion but denied it on the merits.

Guideline § 4A1.3 permits a district court to depart downward from the identified Guidelines range where "a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history." U.S.S.G. § 4A1.3. "[T]his court does not have jurisdiction to review refusals to depart under § 4A1.3 when the sentencing court is aware of its authority to depart." *United States v. Hall,* 7 F.3d 1394, 1396 (8th Cir.1993). However, we retain jurisdiction in circumstances where the district court was unaware of its authority to grant a downward departure. *See id.*

After reviewing the record, we conclude that the district court was aware of its authority to grant a downward departure but simply chose not to do so. Hawkins requested a downward departure on the basis that his "criminal history category overstates the seriousness of his prior criminal behavior," and offered argument in support of the motion. *Id.* at 8. The government, in arguing that the motion should be denied as untimely, specifically cited § 4A1.3. *Id.* at 12. The court then accepted the untimely motion and denied it on the merits in no unequivocal terms. The facts of this case are different from those where the district court did not acknowledge its power to depart from the applicable Guidelines range under § 4A1.3 or address the defendant's motion for departure. *See United States v. Gayles,* 1 F.3d 735, 739 (8th Cir.1993) (remanding to district court for opportunity to consider propriety of downward departure where court did not acknowledge its power to depart and did not address defendant's motion for departure). Accordingly, we lack jurisdiction.

### III.

For the reasons enumerated above, we affirm the judgment of the district court.